UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| RANDY ROBICHAUX, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3:12-CV-40 |
| | § | |
| UNITED STATES ARMY CORPS OF | § | |
| ENGINEERS | § | |
| | § | |
| Defendants. | | |

## MEMORANDUM AND OPINION ENTERING
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Randy Robichaux was struck by a wet mooring line while working as a tankerman on a barge passing through an industrial canal lock near New Orleans in October 2011. He contends that this incident was caused by the negligence of the lock attendant—an employee of Defendant U.S. Army Corps of Engineers—and brings this suit to recover damages for medical expenses, lost wages, and pain and suffering. The Corps responds that Robichaux's injuries were due to his own negligence and the negligence of his employer, Kirby Inland Marine. Furthermore, the Corps contests the magnitude of his alleged damages. Prior to trial, Robichaux settled his claims against his employer.

A bench trial was held on March 3–5, 2014 to address the Corps' liability and any damages. The Court heard testimony from Plaintiff Randy Robichaux and Lam Huynh—the Corps' lock attendant at the time of the incident—as well as

other witnesses, including experts from both sides. Having considered that testimony, the exhibits, the governing law, and the post-trial briefing, the Court reaches the following findings and conclusions.

## I.    FINDINGS OF FACT

### A. The Parties and Witnesses

Plaintiff Randy Robichaux began working for Kirby Inland Marine in November 2006 as a deckhand. After completing additional training at Kirby, Robichaux eventually became a Coast Guard-licensed level four tankerman. Trial Tr. Vol. 1 at 38:3–39:11, 40:6–9 (Docket Entry Nos. 69, 69-1, 69-2, 69-3, 69-4, 69-5, 69-6). Robichaux was assigned to the M/V WALTER S, a pushboat that transports barges around the inland waters of Louisiana. *Id.* at 41:13–22. On the day of the incident, he was working on a barge pushed by the WALTER S that was transiting the Inner Harbor Navigation Canal Lock. Robichaux was familiar with the lock's procedures, having transited through it over 100 times. *Id.* at 43:11–18.

Prior to his work as a deckhand and tankerman for Kirby, Robichaux held a variety of jobs. After finishing high school, he worked as a deckhand until he "had enough of the water," and then as a nursing aid for about 5 years. *Id.* at 30:4–32:25. He moved and began working in the fast food industry—first as a driver and later the general manager at Papa John's in Mississippi and then as a shift manager at Burger King in Louisiana, each for about four to five years. *Id.* at

33:1–34:9.  Robichaux's last job before working for Kirby was a one-year contract position as a welder's helper.  *Id.* at 34:10–35:7.

Defendant U.S. Army Corps of Engineers operates the Inner Harbor Navigation Canal Lock in New Orleans, Louisiana.  *See* Figure 1, Pltf. Ex. 23.  The Canal allows vessels to travel between the Mississippi River and Lakes Borne and Pontchartrain in Louisiana, a shorter route than traveling through the Mississippi River to the open sea.  Trial Tr. Vol. 2 at 162:21–163:9 (Docket Entry Nos. 70, 70-1, 70-2, 70-3, 70-4, 70-5, 70-6); Trial Tr. Vol. 1 at 44:1–8.  To pass through the lock from south to north, a vessel enters through the southern lock gate.  Trial Tr. Vol. 2 at 166:21–167:5.  A deckhand or tankerman from the Canal is then stationed on each side of the barge to help guide the vessel into position and, once in position, the lock gate closes and the vessel is secured to the "pin[s]" or "bollard[s]" on the Canal.  *Id.* 167:25–168:12, 167:22–168:4.  Because the water level south of the Canal is higher than the water level to the north, the lock allows the water level to drop through a gravity-powered draining mechanism so that the vessel can move through the Canal.  *Id.* at 168:12–24.



**Figure 1**

Lam Huynh has been employed by the Corps as a lock attendant since the fall of 2007, and his duties include tying and untying vessels transiting the lock. Tr. Vol. 1 at 132:12–14, 142:21–25, 147:14–20. Huynh was working as the north end lock attendant at the time of the incident, but he does not remember the transit of the WALTER S or anything unusual that day. *Id.* at 136:18–137:6, 147:19–20. Mr. Huynh appeared to have some difficulty understanding the questioning by Plaintiff's counsel. *See, e.g.*, *id.* at 131:23 ("Q: What waterways are connected by the Industrial Canal Lock where you work? A: Oh, I don't understand the question yet."); 136:18–22 ("Q: Because you don't remember the events of October 11, 2011, all that you can tell Judge Costa here today about your work at that lock is that your usual ordinary process was for working at that lock, correct? A: What do

you mean by that question?"); 149:24–150:1 ("Q: Is it okay for a vessel to have lines hanging off the vessel when it's in the lock? A: I don't understand the question.").

Other than Robichaux and Huynh, only one other witness who was present at the scene of the incident testified. James Tutor was Kirby's pilot of the WALTER S as it pushed the barge through the lock on the day of the incident. He testified by deposition about what he saw from the wheelhouse and his conversations with Robichaux related to the incident. Tutor Dep. 21:21–23, 34:22–36:2.

The following experts testified as to liability:

- **Maurice Ryan.** Ryan studied nautical science at the U.S. Merchant Marine Academy, has held a master's license to work as a Captain, and is an accredited inspector for the Oil Companies International Marine Forum. He works as a marine auditor, inspector, and consultant. As Robichaux's retained maritime liability expert, he testified about the standard of care for navigating locks and mooring on a barge.

- **David Scruton.** Scruton studied maritime studies at Liverpool University, holds a master's license to work as a Captain, and is currently the CEO of 3D Marine USA, Inc., a marine consulting and surveying company. As the Corps' retained maritime liability expert, he testified about his observations of the lock's operations after the incident and the standard of care for navigating locks and mooring on a barge.

On damages, the following witnesses testified:

- **Gerard Gabel.** Gabel is a fellowship-trained orthopedic surgeon with a sub-specialty in treating the hand and upper extremities. He was hired by Kirby to treat Robichaux's injuries after the incident. Gabel testified about Robichaux's shoulder treatment, including the surgery he

performed, and his opinion of Robichaux's current capabilities and level of injury.

- **David Baskin.**  Baskin is a fellowship-trained neurosurgeon who has performed thousands of spinal fusion surgeries.  He was hired by Kirby to perform an independent medical evaluation of Robichaux, and he provided his opinions about the cause of Robichaux's neck pain and necessary treatments.

- **Kenneth Berliner.**  Berliner is an orthopedic surgeon who has performed thousands of spine and shoulder surgeries.  Robichaux's attorney referred him to Berliner for his ongoing shoulder and neck pain.  Berliner testified about his examination and treatment of Robichaux and his opinion of Robichaux's current capabilities and level of injury.

- **Michael Sellars.**  Sellars is a private investigator who was hired by Kirby to take video of Robichaux's daily activities.  He testified about his observations and video surveillance of Robichaux over 20 days between May 2012 and September 2013.

- **John Wills.**  Wills is a forensic accountant, licensed CPA, and certified master analyst and fraud examiner, who has worked in the private sector and taught accounting at Georgetown's MBA program.  As the Corps' damages expert, he testified about Robichaux's past lost wages and future loss of wage earning capacity.

- **Kenneth McCoin.**  McCoin is an economist with a Ph.D. who worked in the private sector and taught in MBA programs at several universities in Houston. He currently works as a consultant and was retained by Robichaux as a damages expert.  He testified about his calculations of Robichaux's past lost wages and future loss of wage earning capacity.

- **Robert Dewar Cox.**  Cox is a vocational rehabilitation counselor who works with disabled and injured clients, and was retained by the Corps as a vocational expert.  He testified about categories of jobs that Robichaux is qualified for, physically able to perform, and that are available near where Robichaux lives.

## B. The Incident

On October 11, 2011, Robichaux was working the noon to six shift as a tankerman responsible for handling the port bow mooring line of the M/V WALTER S.  Trial Tr. Vol. 1 at 44:6–24, 45:10–13.  That day, the WALTER S was hired to assist the M/V ANN BRENT in pushing a barge through the Inner Harbor Navigation Canal Lock.  *Id.* at 44:6–20.  Before Robichaux started his shift for the day, the barge was transferred from the ANN BRENT to the WALTER S with mooring lines already on it.  *Id.* at 44:13–16, 55:13–15.

At approximately 12:45 p.m., the WALTER S began traveling through the lock from the Mississippi River toward Lake Pontchartrain, in a northerly direction.  *Id.* at 45:17–23; Trial Tr. Vol. 2 at 162:2–24.  The Mississippi River side of the gravity-fed lock was 1.6 feet higher than the Lake Pontchartrain side of the lock at the time of the incident, which meant the tow dropped 1.6 feet while it was in the lock.  *Id.* at 164:22–165:6, 168:12–16.  The WALTER S, which is about 50 feet long, was pushing a single loaded tank barge, which is approximately 300 feet long—making the entire tow about 350 feet long.  *Id.* at 168:2–4.  Several bollards atop the lock wall are painted different colors and used to secure vessels' mooring lines as they pass through the lock.  For tows with 300-foot barges, the mooring lines are secured to a green bollard, or bitt.  Trial Tr. Vol. 1 at 91:10–16; Trial Tr. Vol. 2 at 168:2–4.

Although Huynh does not remember the transit of the WALTER S on October 11, 2011, he testified that he always follows the same procedure for vessels transiting the lock. Trial Tr. Vol. 1, 136:18–137:6. As a vessel enters, he lowers a light heaving line to the transiting vessel at the appropriate location over the side of the lock. The deckhand on the vessel then ties the heaving line to the vessel's heavier mooring line, allowing the lock attendant to retrieve the mooring line from above and secure it to the bollard. *Id.* at 149:8–18.

As Robichaux entered the lock on October 11, 2011, he did not see a lock attendant, but he did see that the heaving line was hanging over the side of the lock wall by the green bollard. *Id.* at 91:10–16. Robichaux tied the mooring line to the heaving line, called to the lock operator to pull up, and the mooring line was lifted to the top of the wall. *Id.* at 57:17–21.

When Robichaux first picked up the mooring line, he realized that the cotton line was wet. *Id.* at 55:19–22. However, once Robichaux took his position on the port bow of the barge in tow, he could not go back to the WALTER S to find another line to use because he was responsible for guiding Tutor—the pilot —into the lock by radio. *Id.* at 56:5–10. The weight per foot of a cotton mooring line when it is wet is roughly five pounds per foot. Tr. Vol. 2 at 178:18–22, 64:10–11. Other types of mooring lines such as synthetic polypropylene are lighter and

preferable to cotton lines because they float and absorb a smaller amount of water. *Id.* at 178:4–22.

After the bow mooring line was secured to the bollard, Robichaux was still responsible for tending to it, including letting out slack as the water level dropped. Trial Tr. Vol. 1 at 59:10–60:4; *see also* Figure 2, Def. Ex. 8. When the water drained from the lock, the top of the lock wall was about 15 feet above the deck of the barge, or about 10 feet above Robichaux's head. Trial Tr. Vol. 2 at 206:21–207:22. Generally, once the water level is equalized on both sides of the lock's exit gate, the lock operator opens the gate and sounds a "very noticeable" horn. *Id.* at 168:21–24.

On the day of the incident, when the north gate of the lock opened, the barge surged back, which created roughly 40 feet of slack in the bow mooring line, according to Robichaux. Trial Tr. Vol. 1 at 62:19–22, 64:14–17. To ensure that the slack did not fall in the water or get caught between the barge and the lock wall, where it could be severed and end up hitting the propeller, Robichaux "hurried up and undid [his] wraps" and started to pull in the slack as quickly as possible. *Id.* at 63:23–65:4. Scruton questioned Robichaux's testimony about the amount of slack, stating that "it didn't make sense" for several reasons—a surge of a few feet and a drop of 1.6 feet in water height would not produce 40 feet of slack, and if there was a surge, it would have been from high to low water so the barge



should have surged forward, which "would have made the [bow] line tighter" not looser. Trial Tr. Vol. 2 at 171:8–18, 176:6–177:3. Furthermore, he added that "the main concerns when a rope goes into the water" are when "it's at the stern because you have the propeller turning." *Id.* at 174:17–19. In contrast, if a bow line falls in, "it's not really a problem [because t]he deckhand can literally just pull it back up." *Id.* at 174:21–24.

**Figure 2**

Robichaux was aware that the lock gates had opened, signaling that the tug and barge were getting ready to depart. Trial Tr. Vol. 1 at 91:18–19. But he did not know that the mooring line was free, he testified, because he had not heard a warning or received any signal from the lock operator. *Id.* at 66:12–15. Robichaux never saw or heard any warnings from a lock operator during the entire

transit of the vessel through the lock on October 11, which in his experience was "very unusual." *Id.* at 52:16–25. He described that normally "a lock guy was always standing up there" to first direct where he wants the barge, then to drop down the heaving line, and finally to "holler" and toss the mooring line back onto the barge as it leaves. *Id.* at 53:2–22, 66:3–11. From where Robichaux was standing—on the port side of the deck close to the lock wall—he could not see the lock operator or the green bollard to see if the line was still attached. *Id.* at 62:6–12, 63:14–16.

As Robichaux was pulling in the slack, the mooring line came over the edge of the lock wall bunched together. *Id.* at 68:8–10. He did not have time to move out of the way and was only able to raise his arm and turn his back to avoid being struck in his face. *Id.* He was struck by the wet mooring line in the head and along his arm. Robichaux felt like he had been "popped from behind with a two-by-four" and cried out using a profanity. The impact was hard enough to force his raised arm downward toward the deck. *Id.* at 68:10–25.

From the wheelhouse of the WALTER S, Tutor observed "from a distance" what happened but could not hear anything that was said. Tutor Dep. 60:5–25. He saw Huynh remove the mooring line from the bollard and place it on top of the lock wall. *Id.* at 69:12–22. He then witnessed Robichaux pull on the line and get struck in the back as he was facing "away from the lock wall." *Id.* at 66:4–13.

Tutor estimated that Robichaux was standing six to eight feet from the lock wall on the port side of the barge and "wasn't looking toward the boat." *Id.* at 66:14–67:12. According to Tutor, a tankerman is generally responsible for "paying attention to what the lockman wants" and in particular, as the lines are prepared to be dropped, it is important for the tankerman to "step away [from the lock wall] and look up so he'll know when [the lockman is] dropping [the lines] and can talk to him." Tutor Dep. at 58:3–59:7. Scruton agreed, based on his observations of the lock operations over a year after the incident. He observed that deckhands stood "towards the center line of the barge" where they could see the lock attendant, because "once that horn is sounded, that is the signal that the rope is going to come down." Trial Tr. Vol. 1 at 172:4–15, 173:13–174:5.

The Lock Operating Instructions specify that the Lock Operator should be in a location to observe and communicate with the deckhand at all times while locking. Pltf. Ex. 33 ¶ A6. In particular, they instruct the operator: "Before casting off mooring lines, make sure you make eye contact with the deckhand and verbally warn them that you are about to cast off the line." *Id.* ¶ E3. Huynh's ordinary operating procedure was to leave the mooring line next to the green bitt, walk to the railing in front of the barge, instruct the deckhand to "[s]tep back 10 feet and pull slowly," and then watch the deckhand pull the mooring line in. Trial Tr. Vol. 1 at 180:17–25. He testified that if he was standing in this position in

front of the barge watching a deckhand pull in the line, he would see if a deckhand was hit with the line and would take a picture and the head lock operator would report it immediately; this has never happened, in his experience. *Id.* at 182:18–183:20.

Ryan testified that Huynh's actions were negligent because a mooring line should never be allowed to free fall when there is a person below it; instead, the line should be lowered in a controlled manner using a messenger line. *Id.* at 105:25–106:8, 108:4–13, 110:23–111:2. Ryan's opinions were based on publications written by the Oil Companies International Marine Forum and the Steamship Mutual Protection and Indemnity Club that were intended for supertankers—much larger vessels than barges.

### C. Robichaux's Injury and Treatment

After the tow left the lock, Robichaux complained to Tutor of shoulder pain from being hit by the line, but no official report was made. Despite this pain, he continued performing his job aboard the vessel for the rest of the day. Trial Tr. Vol. 1 at 69:1–6, 71:3–21; *see also* Tutor Dep. at 48:10–49:8 (explaining that after clearing out of the locks, Randy told Tutor his shoulder and back hurt). The next day around lunchtime when he awoke, Robichaux reported that he could not continue working due to the shoulder injury. Trial Tr. Vol. 1, 72:2–23. He was sent ashore for treatment at East Jefferson General Hospital, where he reported that

he had a throbbing pain in his shoulder.  *Id.* at 72:10–74:2.  The doctors at East Jefferson indicated that Robichaux probably had a torn rotator cuff.  *Id.* at 72:10–18.

Two days later, Kirby had Robichaux examined by Dr. Gabel for further treatment for pain in his "shoulder down through the arm."  *Id.* at 75:8–17; Trial Tr. Vol. 2 at 38:17–24.  Gabel sees approximately five to ten patients that are Kirby employees each year; Kirby pays for their treatment.  *Id.* at 6:16–7:3.  After taking x-rays and performing a physical examination, Gabel diagnosed Robichaux with an acute rotator cuff strain and possible rotator cuff tear and prescribed a conservative treatment including oral medication, cortisone injections, and physical therapy.  *Id.* at 10:19–12:5.  When Robichaux did not respond to the treatment, Gabel ordered an MRI, which revealed a partial thickness tear of the rotator cuff.  Def. Ex. 9; Trial Tr. Vol. 2 at 11:16–12:18.  Gabel performed arthroscopic surgery to repair the rotator cuff tear on January 18, 2012 and then started Robichaux on a physical therapy program.  Trial Tr. Vol. 2 at 13:15–14:1.  During a post-operative appointment with Gabel on February 13, 2012, Robichaux stated he was experiencing pain in his neck.  *Id.* at 16:8–17:15.  Gabel did an x-ray of Robichaux's neck and lifted Robichaux's arm up into the air to demonstrate that he did not have a frozen shoulder but did not perform further testing.  *Id.* at 43:1–7, 69:19–70:8.

On March 21, 2014, Robichaux visited Dr. Berliner based on a referral from his attorney.  Trial Tr. Vol. 1 at 79:24–80:2, 88:11–14, 218:9–10.  Over several subsequent visits, Berliner performed diagnostic tests of Robichaux's neck and shoulder, including an axial compression test and an O'Brien's test, and ordered an MRI and a CT myelogram.  *Id.* at 223:14–224:15, 228:13–24, 236:20.  Berliner diagnosed Robichaux with postoperative rotator cuff tendonitis and impingement syndrome with inflammation of the joint capsule of the left shoulder that was causing stiffness ("frozen shoulder"), as well as cervical disc protrusions at C4-C5, C5-C6 and C6-C7 caused by trauma.  *Id.* at 230:7–12, 234:2–9.  After treating Robichaux with additional physical therapy and steroid injections, Berliner recommended two surgeries: (1) arthroscopy for Robichaux's frozen shoulder to remove scar tissue and reestablish his range of motion, and (2) cervical spinal fusion surgery to decompress the spinal canal and thus relieve pain.  *Id.* at 234:19, 245:21–23.  Berliner testified that he did not believe Robichaux's condition was likely to improve without these surgeries.  *Id.* at 248:12–15.

The Corps' medical experts disagreed with Berliner's diagnoses and recommended surgeries.  Gabel testified that Robichaux did not suffer from a frozen shoulder, based on his range of motion during an office visit and in the surveillance video showing his daily activities without any visible pain aversion or avoidance, and that Robichaux did not need additional surgery.  Trial Tr. Vol. 2 at

18:5–20:24, 25:16–28:5; Def. Ex. 9. Baskin, a neurosurgeon who examined Robichaux for an independent medical evaluation but did not treat him, diagnosed his neck and arm tingling as spondylosis—a degenerative condition, not related to a traumatic event. Trial Tr. Vol. 2 at 99:20–101:4. He did not believe Robichaux needed spinal fusion surgery. *Id.* at 103:13–104:10.

Gabel gave Robichaux a full work release on October 5, 2012. Trial Tr. Vol. 2 at 21:3–15. Berliner, however, opined that Robichaux was not capable of performing heavy labor as of October 2012 because of his remaining shoulder and neck injuries, and thus it was not proper to give him a full work release. Trial Tr. Vol. 1 at 227:12–22. Robichaux has not returned to work since the injury because he suffers from continued disabling pain in his shoulder and neck. *Id.* at 84:8–25.

Kirby hired Sellars, a private investigator, to observe Robichaux and take surveillance video of him performing daily activities. *See* Def. Ex. 6. Sellars observed Robichaux on 20 separate days between May 2012 and September 2013 and testified that he never saw Robichaux grimace, show signs of pain, or hesitate to use his injured arm. *Id.* at 269:1–22. At trial, Gabel pointed out the lack of any pain aversion or avoidance by Robichaux in the surveillance video and noted Robichaux was moving in ways that are inconsistent with Berliner's assessment of Robichaux's range of motion. Trial Tr. Vol. 2 at 21:20–26:17, 28:6–14; Def. Ex. 6.

## II.  Conclusions of Law

### A. Liability

Robichaux has the burden of proving that the negligence of the United States is the "'legal cause' of [his] injuries." *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992).  This means that "the negligence must be a 'substantial factor'" in causing the injury.  *Thomas v. Express Boat Co., Inc.*, 759 F.2d 444, 448 (5th Cir. 1985).  Accordingly, Robichaux has the burden to prove "more than 'but for the negligence, the harm would not have resulted.'" *Donaghey*, 974 F.2d at 649 (citations omitted).

After considering all the testimony and evidence presented, the Court concludes that Huynh did not make eye contact or verbally warn Robichaux that the mooring line was off the bollard.  Robichaux had a specific memory of the day of the incident—understandable given its impact on him—whereas Huynh testified only to his general practice.  Huynh was also very confused when questioned about the Corps' procedures and other issues, which casts doubt on his claim that he consistently followed those procedures (one needs to understand them in order to follow them).  Finally, there is substantial evidence showing that Robichaux was standing too close to the lock wall—that was a mistake on his part (more on that later), but also makes it unlikely that Huynh was able to see him before dropping the line.  Furthermore, it was essentially undisputed that the line hit Robichaux: the

pilot saw the contact and Kirby's doctor diagnosed Robichaux with a tear to his rotator cuff. If Huynh had been able to see Robichaux when releasing the line, he would have seen the contact, but he said he did not.

Given this credibility determination in favor of Robichaux that Huynh did not warn, it easily follows that the failure to make eye contact or warn was negligent. Indeed, the Instructions for Lock Operators state that an operator should "make sure you make eye contact with the deckhand and verbally warn them that you are about to cast off the line." Pltf. Ex. 33 ¶ E3. Huynh's conduct, while acting in the scope of his employment for the Corps, was therefore a substantial factor in causing Robichaux's injury.

The Court is not persuaded that Huynh should have used a messenger line, however, both because the guidelines that Ryan referenced were for much larger vessels and because Robichaux's and Scruton's testimony demonstrated that use of a messenger line is not customary in the fast-paced operation of moving through a lock.

Robichaux also bears some blame for the incident, however. The Corps has the burden of proving any negligence on the part of Robichaux. *Miles v. Melrose*, 882 F.2d 976, 984 (5th Cir. 1989). The Court concludes that Robichaux was also negligent because he stood too close to the lock wall and pulled on the mooring line, even though he knew the gates were open and the line would be coming down

imminently.  Tutor and Scruton testified that Robichaux was standing close to the lock wall at a time when he should have been in the middle of the barge. Robichaux's conduct was therefore a substantial factor in causing the injury.

In its post-trial briefing, the Government also seeks a determination of Kirby's negligence, but not enough information was presented at trial about Kirby's actions for the Court to conclude it was negligent.  The testimony about the cotton line being inferior was perhaps the only focus on Kirby's negligence, but not enough evidence was produced on that point to support an allocation of liability to Kirby.

In comparing Robichaux's fault and the Corps', the Court concludes that the Corps bears more of the responsibility as the last actor in this incident.  The most proximate cause of the injury—tossing the rope that hit Robichaux—is attributable to the Corps.  Just as the second car in a rear-end collision is typically more at fault even when the first car was negligent, the party directly responsible for the injurious contact in this case is more responsible.  In addition, although Robichaux should have stood further away from the side of the lock and been looking up, that very possibility that a deckhand will not be ready for the release is why a lock operator is supposed to make eye contact and warn.  For these reasons, the Court concludes that the Corps is 65% responsible and Robichaux is 35% responsible for damages.

### B. Damages

Recoverable damages under maritime law include medical expenses, past wage loss, future wage loss, and pain and suffering.  *Masinter v. Tenneco Oil Co.*, 867 F.2d 892, 898 (5th Cir. 1989), *mod. in part, aff'd in part* 929 F.2d 191 (5th Cir. 1991); *see also* Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5–16 (5th ed. 2011).  Robichaux has the burden to prove that he suffered damages.

#### i.  Past Lost Wages

Robichaux's damages expert—McCoin—calculated Robichaux's past lost wages to be $97,452, but conceded that this amount should be reduced by post-injury wages paid to Robichaux by Kirby.  Trial Tr. Vol. 2 at 137:12–16, 143:5–12; *see also* Trial Tr. Vol. 3 at 26:16–29:12 (Corps' damages expert explaining why McCoin improperly calculated past lost wages).  The Corps' damages expert—Wills—identified $13,663 in post-injury wages that had been paid to Robichaux.  Accordingly, the Court awards the past lost wages calculated by McCoin reduced by the post-injury wages calculated by Wills for a total of $83,789.  The Court concludes that the other assumptions McCoin made in his calculations were reasonable.

#### ii.  Future Lost Wages

Awards for future wage loss are calculated "based on the difference between what [the Plaintiff] could have earned ['but for' the injury] and what [the Plaintiff]

is able to earn." *Masinter*, 867 F.2d at 899. This element of damages is usually referred to as "loss of future earnings," *Culver v. Slater Boat Co.*, 688 F.2d 280, 288 (5th Cir. 1982), *withdrawn in part* 722 F.2d 114 (5th Cir. 1983), and is properly measured by a plaintiff's earning capacity. "[B]y its very nature the calculation of an award for lost earnings must be a rough approximation. . . . [A]ny lump sum represents only a 'rough and ready' effort to put the plaintiff in the position he would have been in had he not been injured." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 546 (1983).

The parties' estimates of Robichaux's loss of future earning capacity vary widely. The Corps asserts that Robichaux is able to earn a comparable amount to his salary as a tankerman and thus has no future lost earning capacity. In particular, the Corps' vocational expert identified six general categories of jobs, such as bowling alley manager, that according to national labor statistics are available where Robichaux lives and he is qualified and able to perform. Trial Tr. Vol. 2 at 230:22–232:19. Robichaux's expert, on the other hand, calculates that if Robichaux is only able to return to work earning minimum wage—$7.50 per hour—the discounted present value of his future after-tax loss of wage earning capacity would be $565,092. Trial Tr. Vol. 2 at 137:21–24.

The Court concludes that although Robichaux will likely not be able to return to work as a tankerman, given his other job experience including

management positions in the fast food industry, he will likely be able to return to other types of work. However, the Court is skeptical that the general job categories identified by the Corps will be as readily available to Robichaux—a high school graduate with lingering shoulder pain—as its vocational expert asserts. The Court therefore concludes that Robichaux will be able to earn above minimum wage but below his average salary as a tankerman, and thus awards as future lost wages one-third of the amount calculated by Robichaux's expert, which is $188,364 (1/3 * $565,092).

### iii. Past Medical Expenses

Robichaux's treatment by Gabel was paid for by Kirby, but he has incurred medical expenses of $14,537.70 for his additional treatment by Berliner. Pltf. Ex. 1 at 266–70 (Aff. for Cost of Services by Lonestar Orthopedics). The Court concludes that Robichaux's past medical expenses for treatment by Berliner were reasonable to assess and treat his continuing pain. Accordingly, the Court awards $14,537.70 for past medical expenses.

### iv. Future Medical Expenses

Berliner calculates that the reasonable costs for the surgeries he recommends are $75,000 for the cervical spinal surgery and $20,000 for the shoulder surgery, including all pre- and post-operative care. The Corps' medical experts contest both the necessity and costs of these surgeries. After evaluating the conflicting expert

testimony about Robichaux's ongoing medical needs, the Court concludes that Robichaux has continuing pain in his shoulder and neck resulting from the accident. However, the weight of the evidence does not convince the Court that the surgeries recommended by Berliner are reasonable or necessary to treat this pain. The surveillance video taken by the private investigator shows that Robichaux likely does not have a frozen shoulder. The Corps' medical experts also convincingly testified that even if Robichaux does have lingering neck and shoulder pain, surgery would not be the most appropriate treatment for these conditions. While other non-surgical treatments may be reasonable in the future to continue to treat his pain, no evidence was presented of the costs of these other options. Thus, the Court awards no damages for future medical expenses.

### v. Pain and Suffering

An award of damages for pain and suffering "must necessarily depend to a great extent on the trial court's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation." *Hyde v. Chevron U.S.A., Inc*., 697 F.2d 614, 632 (5th Cir. 1983).

Based on the testimony, medical records, and the Court's observations, Robichaux sufficiently demonstrated that he has suffered and will likely continue to suffer physical pain and mental anguish as a result of his injury in October 2011. The Court awards $40,000 for past pain and suffering and $60,000 for future pain

for a total of $100,000.

**III. CONCLUSION**

Based on the findings of fact and conclusions of law set out above,[1] the Court determines that the Corps is 65% negligent and Robichaux is 35% negligent, and awards the following damages:

- Past lost wages of $83,789
- Future lost wages of $188,364
- Past medical expenses of $14,537.70
- Future medical expenses of $0
- Pain and suffering of $100,000

The total damages are $386,690.70. Reduced by 35% based on Robichaux's comparative negligence, Robichaux is awarded $251,348.95 plus pre- and post-judgment interest.

Robichaux should submit a proposed final judgment by January 5, 2015.

Signed this 19th day of December, 2014.

_____
Gregg Costa
United States Circuit Judge
(Sitting by Designation)

---

[1] Any findings of fact that are more properly conclusions of law are so deemed. And any conclusions of law that are more properly findings of fact are so deemed.